239 S.E.2d 415 (1977)
293 N.C. 594
STUDENT BAR ASSOCIATION BOARD OF GOVERNORS, OF the SCHOOL OF LAW, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Carolyn McAllaster, Catherine Reid, Laura Banks, John Meuser, Ann Wall, and Paul Mones
v.
Robert BYRD, Dean of the University of North Carolina School of Law at Chapel Hill, in his official capacity, Ferebee Taylor, Chancellor of the University of North Carolina at Chapel Hill, in his official capacity, William L. Friday, President of the University of North Carolina, in his official capacity, Walter R. Davis, Chairman, Board of Trustees of the University of North Carolina at Chapel Hill, in his official capacity, William A. Dees, Jr., Chairman of the Board of Governors of the University of North Carolina, in his official capacity, and the University of North Carolina.
No. 16.
Supreme Court of North Carolina.
December 15, 1977.
*417 Rufus L. Edmisten, Atty. Gen., by Andrew S. Vanore, Jr., Senior Deputy Atty. Gen., for defendant appellants.
*418 Loflin & Loflin by Thomas F. Loflin, III, and Carolyn McAllaster, Durham, for plaintiff appellees.
LAKE, Justice.
Preliminarily, it was error for the trial court to order the Dean of the School of Law to cause a notice to be given to the public of meetings of the faculty, or of its various committees and subcommittees. The Open Meetings Law, G.S. 143-318.1 to G.S. 143-318.6, contains no provision requiring any body to give to the public notice of any meeting. All that law requires of bodies, to which it is applicable, is that the meetings of any such body be open to the public. The body is not required to send invitations to anyone, or to notify individual members of the public, or the public at large, of the time and place of any meeting held by it for any purpose. The order, as entered in the Superior Court, would prevent a called meeting of the faculty for at least six hours after the need therefor was determined, regardless of the urgency or simplicity of the problem requiring faculty action. Apparently, this portion of the order of the trial court derives from a similar requirement in an order entered by the Chancery Court of Tennessee on March 31, 1976 in the case of Fain v. Faculty of the College of Law of the University of Tennessee, 552 S.W.2d 752. The Nebraska Open Meetings Law expressly requires such notice. See: State ex rel. Medlin v. Choat, 187 Neb. 689, 193 N.W.2d 739 (1972). Since there is no comparable provision in the Open Meetings Law of this State, if it were otherwise free from error, the judgment of the Superior Court would have to be modified to delete this provision requiring the giving of notice.
We turn now to the question of whether the Open Meetings Law applies to meetings of the faculty of the School of Law of the University of North Carolina at Chapel Hill. The controlling provision is in G.S. 143-318.2, which reads:
"All official meetings of the governing and governmental bodies of this State * * * including all State * * * commissions, committees, boards, authorities, and councils, and any subdivision, subcommittee, or other subsidiary or component part thereof which have or claim authority to conduct hearings, deliberate or act as bodies politic and in the public interest shall be open to the public."
The constitutional validity of this Act is not before us. We are here concerned only with its meaning and, more specifically, with its applicability to a meeting of the faculty of a state-owned educational institution and meetings of committees and subdivisions of such faculty. The wisdom or lack of wisdom, practicability or impracticability of its provisions are matters for the Legislature, not the courts once the meaning of its provisions is judicially determined. Fain v. Faculty of the College of Law of the University of Tennessee, supra. However, a court may legitimately consider consequences to be anticipated from the respective possible constructions of a statute in determining which of these the Legislature most probably had in mind when it enacted the statute.
So far as the right of nonmembers of the faculty to attend faculty meetings is concerned, the statute affords no basis for distinguishing between enrolled students in the School of Law, rejected applicants for admission, prospective applicants for admission, employees of or students in rival law schools in the State, or other members of the public seeking only a warm shelter on a cold winter's day.
While matters likely to be presented to their meetings will differ in nature, the statute affords no basis for distinction between the faculty of the School of Law, the faculty of the English Department, the Athletic Department or the football coaching staff, the faculty of a public elementary school or of a public kindergarten. It would, in all probability, create substantial consternation in the headquarters of the Athletic Department of the University at Chapel Hill if a rival school's coach appeared and demanded admission to a conference of the University's football coaching staff called to consider strategy to be *419 pursued in a forthcoming contest with the team of such other institution, or a meeting of a subcommittee called to discuss the qualifications of prospects for recruitment for next year's team. We fail to find in G.S. 143-318.3 any ground for the denial of such demand if G.S. 143-318.2 is applicable.
The brief for the defendants directs our attention to the Family Educational Rights and Privacy Act, enacted by the Congress of the United States in 1974, commonly called the Buckley Amendment, 20 U.S.C.A. § 1232g(b)(1) which provides, "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of educational records (or personally identifiable information contained therein other than directory information)" concerning a student without his consent. The brief for the defendants suggests that such information may well be the subject of discussion in a meeting of the faculty or any of its committees, and since the Buckley Amendment is part of the Supreme Law of the Land, pursuant to Article VI, section 2, of the Constitution of the United States, it controls the Open Meetings Law. This argument is not, however, determinative of the present appeal. The Buckley Amendment does not forbid such disclosure of information concerning a student and, therefore, does not forbid opening to the public a faculty meeting at which such matters are discussed. The Buckley Amendment simply cuts off Federal funds, otherwise available to an educational institution which has a policy or practice of permitting the release of such information. Thus, if the Open Meetings Law applies to a meeting of the faculty of the School of Law at which such matters are discussed, the right of the public to attend such meeting would continue. Only the availability of Federal funds in aid of the institution would be affected. Of course, a violation of the Buckley Amendment could well result, not only in termination of any otherwise available Federal financial aid to the School of Law but also in the termination of any such aid to the entire University.
Since the Buckley Amendment was enacted by Congress after the Open Meetings Law was enacted by the North Carolina Legislature, it sheds no light upon what the North Carolina Legislature had in mind when it enacted the Open Meetings Law. However, the possibility that all further Federal financial aid to the entire University of North Carolina, including all its component institutions, may be jeopardized by an interpretation of the Open Meetings Law making it applicable to meetings of the faculty of the School of Law is an additional reason for care in so construing the Open Meetings Law.
The only meetings required by G.S. 143-318.2 to be open to the public are official meetings of the "governing and governmental bodies of this State and its political subdivisions," including specified types of "subsidiary or component" parts of such bodies. (Emphasis added.)
Obviously, the faculty of the School of Law is a "component part" of the University of North Carolina at Chapel Hill. This alone does not bring its meetings within the scope of G.S. 143-318.2. For its meetings to fall within the scope of the Open Meetings Law, the faculty of the School of Law must (1) be a component part of a "governing and governmental" body of the State (emphasis added), and (2) the faculty must "have or claim authority to conduct hearings, deliberate or act" as a "body politic." Nothing in the record before us, including the uncontroverted facts found by the trial court, suggests that the faculty of the School of Law of the University of North Carolina at Chapel Hill acts upon different types of matters, or through different procedures, or in any different manner, than does the faculty of any other school of law, including the three schools of law presently operated in this State by privately endowed and operated educational institutions.
Webster's New International Dictionary, 2nd Edition, defines "body politic" as "a group organized for government; now usually specif.: a. a state * * * * b. an *420 organized society, as in a church." In Ballentine's Law Dictionary, the term "body politic" is thus defined: "The term is aptly defined in the preamble of the state constitution of Massachusetts as a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." This definition was quoted with approval by the Supreme Court of the United States in Munn v. Illinois, 94 U.S. 113, 124, 24 L.Ed. 77, 84 (1876), and by this Court in Durham v. Cotton Mills, 141 N.C. 615, 642, 54 S.E. 453 (1906). Ballentine's Law Dictionary defines the related term "body politic and corporate" as "A term often applied to a municipal corporation" and says, "A county is such a body." In 11 C.J.S., p. 380, the term "body politic" is interpreted as follows:
"A term of ancient origin, the collective body of a nation or state as politically organized, or as exercising political functions; the state or nation as an organized political body of people collectively; a corporation, a body to take in succession, framed as to its capacity by policy. It has been said that the phrase connotes simply a group or body or citizens organized for the purpose of exercising governmental functions; that such a group may be large or small, and that it may be a group within a group, including counties even though they are but agencies of the state. It may be formed by a voluntary association of individuals, and is a social compact by which the whole people covenants with each citizen and each citizen with the whole people that all shall be governed by certain laws for the common good. Where the term is used as referring to the state, it signifies the state in its sovereign, corporate capacity, and applies to a body incorporated by the state and charged with the performance of a public duty, such as an institution of learning for the benefit of the people of a particular parish, or a corporate body created for the sole purpose of performing one or more municipal functions, or an incorporated board of trustees of a levee district, or a township declared by statute to be a body politic and incorporate. Also, it applies to the United States as a body capable of attaining the objects for which it was created, by the means which are necessary for their attainment."
Corpus Juris Secundum cites as authorities for these various applications of the term "body politic" numerous cases. The only one of these indicating that the term "body politic" extends to "an institution of learning" is School Board of Caldwell Parish v. Meredith, 139 La. 35, 71 So. 209 (1916).
Speaking of the term "body politic and corporate," the Supreme Court of Nebraska, in Lindburg v. Bennett, 117 Neb. 66, 219 N.W. 851 (1928), said that the term, as applied to a county, is conjunctive rather than disjunctive, and, therefore, it cannot be said that when the members of the county board deal with governmental matters they are acting as agents of the county in exercising its functions as a body politic, but when they deal with other matters they are exercising its functions as a body corporate.
We think it evident that, as used in G.S. 143-318.2, the term "body politic" connotes a body acting as a government; i.e., exercising powers which pertain exclusively to a government, as distinguished from those possessed also by a private individual or a private association. Thus, the language of this statute, extending its reach to meetings of commissions, subdivisions and component parts of "governing and governmental bodies of this State" which "act as bodies politic," is designed to be restrictive, rather than broadening, and shows an intent of the Legislature to limit the Open Meetings Law to meetings of "governing and governmental bodies" strictly construed. (Emphasis added.)
The statute uses the term "governing" and the term "governmental" in the conjunctive, not the disjunctive relation. Thus, the body to which this statute applies must be both a "governing" body and a *421 "governmental" body. Is the faculty of the School of Law of the University of North Carolina at Chapel Hill such a body? If not, is it a component part of such a body which, itself, acts as a "body politic"?
In ordinary speech, the "governing body" of an institution, organization or territory means the body which has the ultimate power to determine its policies and control its activities. Such body may delegate to an employee or group of employees authority to make, initially, such decisions, but such employee or group of employees is not the "governing body" so long as his or its determinations are subject to review and reversal by the higher authority, by whose permission such determination is made.
G.S. 116-11(2) vests in the Board of Governors of the University of North Carolina "the general determination, control, supervision, management and governance" of all the affairs of all of the sixteen constituent institutions of the University, including the University of North Carolina at Chapel Hill, of which the School of Law is a part. The faculty of the School of Law are employees of the Board of Governors, authorized by that Board to make certain determinations with reference to the day-to-day operation of the School of Law, but all such determinations by the faculty are subject to the power of the Board of Governors to modify or reverse them. The fact that such superior power is rarely used by the holder of it does not abrogate it. Thus, the faculty of the School of Law is not the "governing body" of the School of Law. The "governing body" is the Board of Governors.
The plaintiffs rely upon the decision of the Chancery Court of Tennessee in Fain v. Faculty of the College of Law of the University of Tennessee, supra, holding the Open Meetings Act of Tennessee applicable to meetings of the faculty of the College of Law of the University of Tennessee. As shown, however, in that decision and also in the decision of the Supreme Court of Tennessee in Dorrier v. Dark, 537 S.W.2d 888 (Tenn.1976), the Tennessee law, unlike our statute, defines "governing body" to mean "the members of any public body * * * with the authority to make decisions for or recommendations to a public body on policy or administration." Such statutory definition would, of course, prevail over the ordinary meaning of the word "governing." Moreover, the Fain case was reversed on appeal, the Tennessee Court of Appeals holding the faculty of the School of Law is not a governing body. 552 S.W.2d 752 (1957).
The faculty of the School of Law is not a "subsidiary or component part" of the Board of Governors, but is simply a group of employees of the Board. Furthermore, the faculty does not act as a "body politic."
If the faculty of the School of Law were a component part of the Board of Governors, the "governing" body of the School, and if it did deliberate and act as a "body politic," that would not make its meetings subject to the North Carolina Open Meetings Law (G.S. 143-318.2) unless the Board of Governors is, in addition to being the "governing" body of the School of Law, also a "governmental" body within the meaning of this Act.
A "governmental body" is one which has at least some of the powers of government. These are powers which are the attributes of sovereignty. They are not possessed by individuals and private associations, as a matter of natural right, and may not be exercised by them unless granted to them by the sovereign. Such powers include, for example, the power to tax, to appropriate public money, to adjudicate controversies, to maintain a police force, to fix and determine rights in property and procedure for its conveyance, to regulate commerce and industry, to condemn private property for public use, to declare specified conduct unlawful and to impose criminal sanctions for engaging therein, and to legislate generally for the public welfare.
A "governmental body" may also exercise nongovernmental powers. These are powers which individuals and private associations may also exercise, as a matter of natural right in the silence of the *422 sovereign. The establishment, maintenance and operation of an educational institution is such a nongovernmental activity. It may be, habitually has been and now is being engaged in by individuals and private associations in this State, including the operation of schools of law. Thus, while a "governmental body" may establish and operate an educational institution, that is not a governmental power and a body which has no other power is not a "governmental body."
The Board of Governors of the University of North Carolina operates the educational institutions comprising the University and has the power to do all acts incidental thereto, but so does the "governing body" of a privately endowed and operated university. The Board of Governors of the University of North Carolina has no governmental powers; i.e., no powers peculiar to the sovereign. G.S. 116-11. Therefore, the Board of Governors is not, itself, a "governmental body of this State," and G.S. 143-318.2 does not extend to the meetings of its employees, even though such employees be deemed a "component part" of the Board of Governors. Consequently, G.S. 143-318.2 does not require that meetings of the faculty of the School of Law of the University of North Carolina be open to the public and the granting of the injunction by the Superior Court in this action was error.
Our decision does not, in any way, affect or diminish the right of students enrolled in the School of Law, or any other person interested in its operation, to attend a meeting of the faculty of the School of Law, with the permission of the faculty, in order to present to the faculty requests and recommendations for faculty action.
We are not unmindful of the fact that G.S. 143-318.3(b) contains this statement:
"Nor shall this Article be construed to prevent any board of education or governing body of any public educational institution, or any committee or officer thereof, from hearing, considering and deciding disciplinary cases involving students in closed session."
The purpose of this provision was simply to remove any possibility that a board of education, a governing body of a public educational institution or a court could believe the Open Meetings Law requires a public hearing of such disciplinary matters. The provision does not extend the scope of G.S. 143-318.2 beyond meetings of "governing and governmental bodies of this State and its political subdivisions."
Again, G.S. 143-318.3(c) expressly authorizes a "board of education" when faced with a riot, or conditions indicating that a riot or public disorders are imminent, to meet in private session with law enforcement officers and others invited to such meeting for the purpose of considering and taking appropriate action. This provision was inserted out of an abundance of caution so as to prevent members of such board from being afraid to act promptly in such emergency. It, too, does not indicate legislative intent to broaden the scope of G.S. 143-318.2.
All of the Open Meetings Laws of the several states, which have come to our attention, vary widely in their terms and so decisions from the courts of those states establishing their scope are of meagre assistance in construing the North Carolina Act.
In McLarty v. Board of Regents of the University of Georgia, 231 Ga. 22, 200 S.E.2d 117 (1973), the Georgia "Sunshine Law" was held not to apply to meetings of a faculty-student committee appointed to make recommendations to the Dean of Student Affairs concerning allocation of revenues received from mandatory student fees for student activities. The statute provided meetings of any State agency "at which official actions are taken" must be open to the public. The Supreme Court of Georgia said:
"Official action is action which is taken by virtue of power granted by law, or by virtue of the office held, to act for and in behalf of the State. The `Sunshine Law' does not encompass the innumerable groups which are organized and meet for the purpose of collecting information, *423 making recommendations and rendering advice but which have no authority to make governmental decisions and act for the State."
The plaintiffs rely upon Cathcart v. Andersen, 85 Wash.2d 102, 530 P.2d 313 (1975), which held the Open Meetings Law of the State of Washington applicable to meetings of the faculty of the School of Law of the University of Washington. That case is readily distinguishable by reason of substantial differences between Washington's Open Meetings Law and ours. The Washington statute requires, "All meetings of the governing body of a public agency shall be open and public." (Emphasis added.) It defines "public agency" to mean "any state board * * * educational institution or other state agency which is created by or pursuant to statute, other than courts and the legislature." (Emphasis added.) It defines "governing body" as "[T]he multimember board, commission, committee, council or other policy or rule-making body of a public agency." A further statute of the State of Washington provided, "The faculty of the University of Washington * * * shall have charge of the immediate government of the institution under such rules as may be prescribed by the board of regents." The Supreme Court of Washington held that the faculty of the School of Law of the University of Washington must be considered a "`governing body', which is to say that it is a `policy' or `rule-making body.'" We do not consider this decision persuasive upon the question of the proper construction of the North Carolina statute.
The Nebraska Open Meetings Law involved in State ex rel. Medlin v. Choat, 187 Neb. 689, 193 N.W.2d 739 (1972), since replaced, was also much broader in scope than ours, requiring the opening to the public of all meetings of "governing bodies of all agencies, now or hereafter created * * * pursuant to law, of the Executive Department of the State of Nebraska * * * or any other administrative agencies, whether advisory or executive, of the State of Nebraska * * * exercising legislative, executive or administrative powers, or supported in whole or in part by public funds, or entrusted with powers of recommending the expenditure of, or actually expending, public funds." (Emphasis added.) Nevertheless, the Supreme Court of Nebraska in State ex rel. Medlin v. Choat, supra, held the Nebraska law did not apply to a meeting of a school district reorganization committee because it was not a "governing body."
The case of Raton Public Service Co. v. Hobbes, 76 N.M. 535, 417 P.2d 32 (1966), is also distinguishable from the present case. The New Mexico Supreme Court said that the New Mexico Open Meetings Law, then in effect, was captioned "An Act relating to public meetings of all governing bodies of the state which are supported by public funds." (Emphasis added.) The Supreme Court of New Mexico there held a public service company, all of the stock of which was held by trustees for the benefit of the City of Raton and all the revenues of which, after the payment of operating and maintenance expenses, were payable to the City Treasury for general city purposes, was "supported by public funds" and, therefore, its meetings were required by the statute to be open to the public. The New Mexico statute was obviously broader in scope than is the North Carolina Open Meetings Law.
The decision of the Court of Appeals is, therefore, reversed and the injunction issued by the Superior Court of Orange County is vacated.
REVERSED.
SHARP, C. J., concurs in result.
EXUM, Justice, dissenting:
I respectfully dissent from that portion of the majority opinion which holds that the Open Meetings Law, G.S. 143-318.1, et seq., has no application to official meetings of the law school faculty of the University of North Carolina. The majority opinion through lengthy, esoteric, and dictionary definitions of such concepts as "sovereignty," "governmental," and "body politic," has made unnecessarily confusing what is, in fact and in law, a relatively simple case.
*424 We are called on here to construe the Open Meetings Law enacted by the 1971 General Assembly. The primary function of a court in construing any legislative act is to insure that effect is given to the legislative intent. The best indicia of that intent are "the language of the statute, the spirit of the act, and what the act seeks to accomplish." Stevenson v. City of Durham, 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972) and cases cited.
The purpose of the Open Meetings Law is a simple and salutary one. It is to insure that the business of the public be conducted in the view of the public so that the people may have the wherewithal to be better informed. The legislature expressly stated the Law's public policy in the first section thereofG.S. 143-318.1a section which the majority strangely fails to mention. The section provides:
"Whereas the commissions, committees, boards, councils and other governing and governmental bodies which administer the legislative and executive functions of this State and its political subdivisions exist solely to conduct the peoples' business, it is the public policy of this State that the hearings, deliberations and actions of said bodies be conducted openly." (Emphasis supplied.)
The spirit of this law is that a democracy works best when the electorate knows how it is working. This kind of law should be liberally, not stintingly, construed. Laman v. McCord, 245 Ark. 401, 432 S.W.2d 753 (1968); Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla.1974). Exceptions to this law, on the other hand, should be narrowly construed. Publishing Co. v. Board of Education, 29 N.C.App. 37, 47, 223 S.E.2d 580, 586 (1976), and cases therein cited.
So construed the Open Meetings Law applies to official meetings of the faculty of this state's largest publicly supported law school.[1] The law school is an important component part of the University. According to the record in this case the law school faculty determines how tax money will be spent in the education of prospective attorneys, many of whom will practice in North Carolina. In doing so it exercises an important governing and governmental function however the majority of this Court tries to tie the meaning of these words to some esoteric notion of "sovereignty." In doing so the law school faculty acts as a "body politic and in the public interest" however, again, the majority tries to explain these words in terms of classroom, dictionary definitions. This is because these terms refer in this Law to nothing more or less than the business of the public. As the governing body of a tax-supported law school, the law school faculty, whatever else it does, helps to conduct the business of the public. Its official meetings should be, to accord with the spirit and purpose of this Law and unless the Law otherwise permits, open to that public. This is the simple and most direct answer to the issue posed in this case.
The majority's fundamental error is its failure to give effect to the fact that the University of North Carolina at Chapel Hill, of which the law school is admittedly a component part, is not simply an institution of higher learning. It is a state owned institution of higher learning, the first of its kind to admit students in the United States. Lefler and Newsome, North Carolina, p. 262 (1973). This institution belongs to the people of North Carolina. Its business is their business. Those who know well its traditions know that perhaps its greatest source of strength and pride is its ownership by and accountability to the people of North Carolina and its own ready recognition of this fact. Quite recently the Chairman of the Board of Trustees of the University at Chapel Hill said publicly[2]:

*425 "I know that faculty members are certain that there would be no University without them. I know that students are certain that it could not exist without them. I know that both groups can prove that it would exist very well without either administration or board of trustees.
"Yet, the University belongs to all of us and its growth and enrichment depend upon our efforts together.
"The University belongs to others as well. It belongs to all of the people of North Carolinathose who love it and those who do not.
"I believe that it is a better place because it is the public's institutionbetter if we acknowledge that ownership not as a handicap but as an asset.
"This University belongs to people who will never come here as a student or as a parent, who may never sit in Kenan Stadium [or] Carmichael Auditoriumor convalesce in Memorial Hospital.
"Those of us who are trustees sense an obligation because of this that is unique to public institutions and, I believe, to a degree that is unique to this particular public institution.
"This does not mean that we pander to the public whim or shy from encounter with the public's opposition when academic freedom or academic excellence require that we take a stand that is unpopular.
"It does mean that we owe it to that public not only to acknowledge their ownership but to include them in our governance, to inform them, to genuinely seek their support, to be respectful of their views, to explain our own and to be as solicitous of their understanding as we are of their tax dollars." (Emphasis supplied.)
To hold that the governing bodies of neither the Greater University of North Carolina, nor the law school on its campus at Chapel Hill are subject to the Open Meetings Law ignores not only the Law's obvious purpose that the public's business be conducted in the public view. It ignores also the University's long tradition of proudly recognizing its ownership by and accountability to the public. One can only wonder whether this tradition lies at the bottom of defendants' failure in this case to file any defensive pleading or motions or to challenge any finding of fact made by the trial judge.
But let us examine the majority opinion in more detail and on its own terms. The main operative provision of the Open Meetings Law, G.S. 143-318.2, provides, in pertinent part:
"All official meetings of the governing and governmental bodies of this State. . . including all State . . . commissions, committees, boards, authorities, and councils and any subdivision, subcommittee, or other subsidiary or component part thereof which have or claim authority to conduct hearings, deliberate or act as bodies politic and in the public interest shall be open to the public." (Emphasis supplied.)
The position of the majority is this: In order for law school faculty meetings to be subject to the provisions of the Open Meetings Law the faculty must be a component part of a "governing and governmental body" and it must also act as a "body politic." The majority concedes that the law school faculty is a component part of the University of North Carolina and apparently concedes that the governing body of the University is the Board of Governors. It concludes, however, that the Board of Governors is not a governmental body inasmuch as operating an educational institution is not a governmental activity and that even if it were, the law school faculty is not a "body politic." I accept one of the majority's definitions of a governmental body as "one which has at least some of the powers of government" and one of its definitions of a body politic, as "a body . . . exercising powers which pertain exclusively to a government, as distinguished from those possessed also by a private individual or a private association."
That the Board of Governors of the University of North Carolina is a governmental *426 as well as a governing body seems to me to be almost beyond argument. The majority correctly defines a "body politic" as a body which exercises governmental powers. In other words a body politic is a governmental body and vice versa. General Statute 116-3 expressly designates the Board of Governors of the University of North Carolina to be and continue "as a body politic and corporate." The General Assembly, itself, has thus designated the Board of Governors as a governmental body. Other provisions of Part II, Article 1, of Chapter 116 reinforce this designation. The General Assembly sets the terms, appoints the members, and delegates the powers of the Board of Governors. G.S. 116-5, 116-6, 116-11. Essentially the General Assembly has in G.S. 116-11 delegated to the Board of Governors the power to "govern the 16 constituent institutions" of the University of North Carolina. It has more specifically in this section empowered the Board of Governors to be "responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions"; to "determine the functions, educational activities and academic programs of the constituent institutions [and] the types of degrees to be awarded"; to elect and fix the compensation of the chancellors of the constituent institutions; to "set tuition and required fees at the institutions"; to "set enrollment levels of the constituent institutions"; and to "develop, prepare and present to the Governor, the Advisory Budget Commission and the General Assembly a single, unified recommended budget for all of public senior higher education."
The Board of Governors is in law and in fact the agent of the General Assembly charged by the legislature with responsibility for operating this state's publicly supported institutions of higher learning.[3] It may be that operating privately supported educational institutions is not a governmental activity; but I am satisfied that operating such institutions, as an agent of the General Assembly, with tax dollars appropriated by the General Assembly is, without question, a governmental activity and that the Board of Governors is a governmental body.
It is abundantly clear that the legislature intended the Board of Governors to be considered a governing and governmental body within the meaning of the Open Meetings Law. General Statute 143-318.3(b) provides: "Nor shall this Article be construed to prevent any board of education or governing body of any public educational institution, or any committee or officer thereof, from hearing, considering and deciding disciplinary cases involving students in closed sessions." Why insert this limitation unless such bodies were otherwise covered by the Law's general operative provisions?
Indeed when this case was argued in this Court, defendants conceded that official meetings of the Board of Governors were subject to the Open Meetings Law. The complaint alleges and the defendants did not deny that the Board of Governors "is the governing body of the University of North Carolina, and the said Board has authority to act as a body politic and in the public interest."
There seems to be absolutely no support in law or in fact for the majority's conclusion that the Board of Governors of the University of North Carolina is not a governing and governmental body subject to the provisions of the Open Meetings Law.
Whether the majority considers the law school faculty a subsidiary or component part of the Board of Governors is not entirely clear. At one point it concedes that the faculty is a component part of the University of North Carolina but at another place in the opinion it concludes that it is not a component part of the Board of Governors but that its members are mere "employees" of that Board. The majority also concludes that the faculty is not "a body politic." Whether the law school faculty is a subsidiary or component part of the Board of Governors and whether it is "a *427 body politic" are essentially questions of fact. The majority mistakenly treats them as questions of law answered by reference only to its own notions of what the faculty is and its relationship to the Board of Governors. In my view the answers to these questions must lie not in the majority's notions of what the faculty is but in what in fact the faculty does and how in fact it is related to the Board of Governors.
The proper place to look for these facts is in the record on appeal. It consists essentially of the allegations of the complaint and the findings of fact of the trial judge. Defendants have filed no answer and have excepted to no finding of fact. Neither, for that matter, have defendants filed a motion to dismiss for failure of the complaint to state a claim pursuant to Rule 12(b)(6), a motion for judgment on the pleadings, Rule 12(c), or a motion for summary judgment, Rule 56. All defendants have done to date is appeal from rulings with which they are, because of their appeals, presumably dissatisfied. Since "[a]verments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading," Rule 8(d), the defendants have judicially admitted that the following facts alleged in the complaint are true:
"11. The University of North Carolina at Chapel Hill School of Law is a component part of the University of North Carolina and of the University of North Carolina at Chapel Hill.
"12. The Law School Faculty of the University of North Carolina at Chapel Hill School of Law . . . is the governing body of the said school of law and has lawful authority to act as a body politic and in the public interest."
Thus plaintiffs allege and defendants admit that the law school is a component part of the University of North Carolina and that its faculty is the governing body of the school and has lawful authority to act as a body politic and in the public interest. It must follow that if the Board of Governors is the governing body of the University, then the law school faculty as the governing body of a component part of that University is a component part or subsidiary of the Board of Governors. On oral argument in this Court defendants conceded that the law school faculty was a component part or subsidiary of the Board of Governors. There is nothing, therefore, in this record or in the briefs or argument to support the majority's conclusion that "the faculty of the School of Law is not a `subsidiary or component part' of the Board of Governors, but is simply a group of employees of the Board." The admitted facts are to the contrary.
The defense in the case is based on the theory that the law school faculty, admittedly a subdivision or component part of a board to which the Open Meetings Law applies, must itself act as a body politic and in the public interest, i.e., be a governmental body, in order to be subject to the law. This is what defendants argue in their brief notwithstanding that they have judicially admitted that the law school faculty in fact acts as a body politic and in the public interest.
If we assume that defendants, for some reason, are not bound by their admissions on this appeal, the facts found by the trial judge on evidence heard by him and not controverted by defendants clearly support his conclusions that the law school faculty acts "as a body politic and in the public interest, within the meaning of G.S. 143-318.2." It is admitted on this record that the law school faculty determines the annual enrollment level of the law school, sets the school's admissions standards, approves the school's curriculum, establishes the rules relating to readmissions of students who, at some point, were academically ineligible to continue in the school, approves the editorial board of the North Carolina Law Review (a publicly distributed legal periodical) and eligibility criteria for the Law Review staff, hires the law school faculty, and determines those who will graduate annually from the school. Many of these decisions are made finally by the law school faculty and are not reviewed by any higher authority. Other *428 decisions such as the hiring of faculty are formally manifested in the nature of recommendations, but since at least 1963 no recommendation made by the faculty has ever been rejected. In fact, therefore, the faculty is making these important decisions itself.
Even if we assume that the faculty makes only recommendations, these recommendations are an integral part of the decision making process.
The Open Meetings Law was designed to reach this entire process wherever it may take place in governing and governmental bodies, their component parts and subsidiaries. To except the law school faculty because some of its decisions are submitted to higher authority in the form of "recommendations" subverts the clear intent of the legislature. Such a holding permits any governmental body, otherwise subject to the Law, to evade it by delegating to a subgroup authority to make initial decisions which when "recommended" are rubberstamped by the delegating body. The Florida Supreme Court, considering that state's comparable "sunshine law," spoke to this very point when it said, in Town of Palm Beach v. Gradison, supra at 477:
"One purpose of the government in the sunshine law was to prevent at non-public meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors. The statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken."
It is admitted by all parties that the law school faculty makes the same kinds of decisions with reference to the law school that the Board of Governors makes with reference to the University as a whole. If the Board of Governors, as I think I have shown, is a governing and governmental body vis-a-vis the University as a whole, clearly the law school faculty is such a body vis-a-vis the law school.
These decisions by the faculty, we must remember, are made regarding a school supported by tax dollars. Clearly in making them the law school faculty is conducting the public's business, making decisions which affect the public interest, and, in short, acting as a body politic.
I do not share the majority's fear that the academic and athletic worlds would crumble if we hold that the Open Meetings Law applies to the law school faculty of our state University. Whether the statute would apply to the English faculty, the Athletic Department, the football coaching staff, or the faculty of a public elementary school or a public kindergarten would depend on what these bodies do in fact, the kinds of decisions they make, and the powers they exercise. To hold that the Law applies to the law school faculty does not necessarily presage a holding that it also applies to these other kinds of faculties.
Neither do I fear that the law school faculty by complying with the Open Meetings Law will somehow run afoul of the Family Educational Rights and Privacy Act, enacted by the Congress of the United States in 1974, 20 U.S.C. § 1232g(b), (d), the pertinent provisions of which are set out in the majority opinion. Compliance with the Open Meetings Law is in nowise equivalent to establishing "a policy or practice of permitting the release of education records" of a student without his consent. There are, moreover, a number of provisions in the Law itself providing for the holding of executive sessions and exclusion of the public if certain sensitive matters are being considered. G.S. 143-318.3. Subsection (b) of this section permits the holding of closed session by bodies otherwise covered by the Law, for example, "to consider information regarding the appointment, employment, discipline, termination or dismissal of an *429 employee or officer under the jurisdiction of such body . . .." This subsection further provides: "Nor shall this Article be construed to prevent any board of education or governing body of any public educational institution, or any committee or officer thereof, from hearing, considering and deciding disciplinary cases involving students in closed session." It may well be that these provisions could be construed to permit the faculty to hold an executive session whenever it was considering confidential information concerning a student or students.
In one state which has heretofore considered the applicability of a similar open meetings law to a law school faculty, the decision was in favor of applicability. Cathcart v. Andersen, 85 Wash.2d 102, 530 P.2d 313 (1975). While there are minor differences between the statutory scheme in Washington and ours here, the case in principle is indistinguishable.
In Fain v. Faculty of the College of Law of the University of Tennessee, 552 S.W.2d 752 (Tenn.App. 1977) the court reached a contrary result. The Tennessee Open Meetings Law as described in the cited opinion is similar to ours in that it requires meetings "of any governing body" to be public. It defines "governing body" as "the members of any public body which consists of two or more members, with the authority to make decisions for or recommendations to a public body on policy or administration." The facts in Fain, however, are vastly different from those here. In Tennessee, as a matter of fact, the law school faculty only makes recommendations to the dean of the law school who, in turn, passes some of them on to higher authorities. The only authority exercised by the Tennessee law school faculty is to make recommendations to the dean. The dean was determined not to be, within the meaning of the statute, a public body but rather an administrative officer. Had the law school faculty in Tennessee made recommendations to a public body, such as the governing board of the University of Tennessee, it seems clear the Court then would have reached a contrary result.
I agree that it was error for the trial court to require the law school faculty to give public notice of its official meetings and I would modify the decision of the Court of Appeals by ordering that this provision of the trial judge's injunction be stricken. As so modified I would vote to affirm the decision of the Court of Appeals.
NOTES
[1] In 1977 the General Assembly appropriated for the biennium beginning in 1977 $162,692,324 of the public's money to the University of North Carolina at Chapel Hill of which $84,631,403 were designated for "academic affairs." 1977 Session Laws, Ch. 802, Part I, Sec. 2.
[2] Speech by Tom Lambeth, University Day Exercises, University of North Carolina at Chapel Hill, 12 October 1977.
[3] The 1977 General Assembly appropriated $686,156,224 of tax monies to the Board of Governors to operate these institutions. 1977 Session Laws, Ch. 802, Part I, Sec. 2.